UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Jason D. Delafontaine

     v.                       Civil No. 1:10-cv-027-JL
                                    Opinion No. 2011 DNH 005
Michael J. Astrue, Commissioner,
Social Security Administration


**MEMORANDUM ORDER**

This is an appeal from the denial of a claimant's application for Social Security Disability Benefits.  See 42 U.S.C. § 405(g).  The claimant, Jason Delafontaine, contends that the administrative law judge ("ALJ") incorrectly found that Delafontaine was not disabled because he retained the residual functional capacity ("RFC") to perform a full range of light duty work, see 20 C.F.R. § 404.1567(b), and that given his age, education and work experience, there were a significant number of employment opportunities available to him.  See id. § 404.1520(a)(4)(v); pt. 404, subpt. P, App. 2, §202.  Delafontaine contends that the ALJ:

    (1) erred in his assessment of Delafontaine's impairments, see id. §§ 404.1520(a)(4)(ii), (c);

    (2) made a residual functional capacity ("RFC") determination that was unsupported by the evidence;

    (3) improperly ignored a treating source opinion, or, in the alternative, should have sought clarification of evidence from that treating source, see id. §§ 404.1527(d),(e); and

(4) failed to give sufficient reasons for discounting another treating source opinion.  <u>See</u> <u>id.</u> § 404.1527 (d)(2); SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

The Commissioner moves for an order affirming the ALJ's decision, asserting that it was supported by substantial evidence in the record.  This court has jurisdiction under 42 U.S.C. § 405(g).  After a review of the administrative record and a hearing on the parties' cross-motions, the court affirms the Commissioner's decision.

## I.   <u>APPLICABLE LEGAL STANDARD</u>

The court's review under Section 405(g) is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999).  If the ALJ's factual findings are supported by substantial evidence in the record, they are conclusive, even if the Court does not agree with the ALJ's decision and other evidence supports a contrary conclusion. <u>See</u> <u>Tsarelka v. Sec'y of Health & Human Servs.</u>, 842 F.2d 529, 535 (1st Cir. 1988).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quotations omitted).  The ALJ is responsible for determining issues of credibility, resolving conflicting evidence, and drawing inferences from the evidence in the record.  <u>See</u>

Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222
(1st Cir. 1981); Pires v. Astrue, 553 F. Supp. 2d 15, 21 (D.
Mass. 2008) ("resolution of conflicts in the evidence or
questions of credibility is outside the court's purview, and thus
where the record supports more than one outcome, the ALJ's view
prevails").  The ALJ's findings are not conclusive, however, if
they were "derived by ignoring evidence, misapplying the law, or
judging matters entrusted to experts."  Nguyen, 172 F.3d at 35.
If the ALJ made a legal or factual error, the decision may be
reversed and remanded to consider new, material evidence, or to
apply the correct legal standard.  Manso-Pizarro v. Sec'y of
Health & Human Servs., 76 F.3d 15, 16, 19 (1st Cir. 1996); see 42
U.S.C. § 405(g).

## II.  BACKGROUND[1]

## A.  Procedural history

In April 2008, Delafontaine, then 31 years old, applied for
disability benefits and supplemental security income benefits
claiming he was disabled since August 30, 2007 due to
debilitating left leg pain.  His alleged disability arose from a

---

[1]The court summarizes the relevant facts as presented in the
Joint Statement of Material Facts (Document No. 12).  See LR
9.1(d).  The court will reference the administrative record
("Admin. R.") to the extent that it recites facts outside the
parties' joint statement or directly quotes documents in the
record.  Cf.  Lalime v. Astrue, No. 08-cv-196-PB, 2009 WL 995575,
at *1 (D.N.H. Apr. 14, 2009).

traumatic leg injury sustained in 1986.  Delafontaine maintains
that over the course of 20 years, the symptoms arising from that
injury had intensified, such that he has "trouble lifting and
carrying things, [and] to walk or stand causes severe pain.  Even
sitting causes discomfort."  Admin. R. 94.  He further alleged
that his "doctors advised me to stop working or I was going to
lose my leg."  Id.  The Social Security Administration denied
Delafontaine's claims in July 2008, determining that he had
"recovered fully" from his leg injury in 1986, and therefore, his
"impairment is not considered to be severe" and he was "able to
return to any of [his] past work."  Id. at 37.

     Delafontaine appealed that decision to the ALJ, who, after a
hearing, affirmed the denial of his claim.  Id. at 21-30.  The
ALJ concluded that although Delafontaine's left leg had
deteriorated such that he exhibited several severe impairments,
he retained the residual functional capacity to perform "a full
range of light work."  Id. at 27.  The ALJ concluded that
although his impairments precluded Delafontaine from returning to
his former work as an insulation installer, see 20 C.F.R. §
404.1520(a)(4)(iv), given his residual functional capacity, age,
and experience, he was capable of performing in a significant
number of jobs in the national economy and was not disabled.
Admin. R. 29-30; see generally 20 C.F.R. §§ 404.1520(a)(4)(v);
404.1520(a)(4)(v), pt. 404, subpt. P, App. 2, §202.  Delafontaine

filed a request to review the ALJ's decision.  The Decision Review Board, see generally id. §405.401, however, did not complete its review in a timely fashion, see id. § 405.415, rendering the ALJ's decision the final decision of the Commissioner.  See id.  This appeal followed.

**B.   Medical and work history evidence before the ALJ**

Delafontaine's medical issues originate with an horrific accident in 1986, when, at age 9, he was struck by an eighteen-wheeled truck after sledding down his driveway and into the road. Admin. R. 197.  Delafontaine sustained an "open left tibial fracture" and "degloving injury" on his left leg that extended from his thigh to his ankle.[2]  He also exhibited muscle and nerve injuries.  Id. at 197-98.  He spent well over a month in the hospital and endured several surgeries to repair his leg.  In May 1987, after removal of a cast on his leg, Delafontaine started using a foot brace.  He had periodic follow-up exams during his adolescent and teen years, and by age sixteen, Delafontaine was still using a leg brace and his left leg was 1.4 cm smaller than

---

[2] The tibia is "the shin bone; the inner and larger bone of the leg below the knee."  Dorland's Illustrated Medical Dictionary, 1952 (31st ed. 2007).  An open fracture is "one having an external wound leading to the break of the bone."  Id. at 753-54.  A "degloving injury" occurs where there is a "stripping of the skin and underlying tissue from the bones." The Merck Manual of Diagnosis and Therapy, 2498 (17th ed. 1999).

his right.  At that time he reported that he "walks nearly as
well without his brace as with it."  Id. at 161 (quotations
omitted).

Many years later, in October 2003, Delafontaine was referred
to an orthopedic specialist, Dr. Delphine Glorieux-Sullivan,
after he had complained of left knee and ankle pain.  Id. at 256.
At that time, Delafontaine was employed installing insulation,[3]
and stated that because he was "up and down ladders all day,
. . . [his work] has exacerbated the problems with his leg."  Id.
at 257.  The practitioner who referred Delafontaine noted that,
although "[h]e is not complaining of any significant pain," id.,
he reported "pain and stiffness, especially in the morning.  It
takes him about a half-hour to get moving each day."  Id. at 256.

After review of Delafontaine's medical records and an x-ray
taken just prior to the exam, Dr. Glorieux-Sullivan noted that
although Delafontaine "as a 9-year-old had a devastating
potentially limb threatening injury to his left lower leg," he
was "left with some very mild residual symptoms, which I think
are soft tissue related."  Id. at 251.  She also stated that the
x-ray demonstrated that the "left tibia . . . [is] surprisingly
normal in appearance.  There was good appearance to the knee,

---

[3]In his application for benefits, Delafontaine stated that
as an insulation installer, he would lift "100 lbs. or more" and
frequently lifted "50 lbs. or more."  Id. at 96.

good joint space both at the knee and at the ankle. . . .  There
is really no residual sign of the previous open fracture." Id.

Delafontaine returned to Dr. Glorieux-Sullivan in August
2006 complaining of knee pain.  Delafontaine reported that

> [h]e has had knee pain for years and denies any recent
> injury or new trauma but rather feels that his leg pain is
> slowly but steadily catching up to him.  He is employed full
> time laying down insulation and this requires him getting up
> and down ladders, kneeling and generally being active.  He
> finds that as the years go on he is having greater and
> greater difficulty doing this.

Id. at 213.  Delafontaine also reported, however, that while
Tylenol did little to relieve his symptoms, "Icy Hot" patches and
"other localized forms of treatment" did offer temporary relief
and that he did not have nighttime knee pain and slept
comfortably at night.  Id.  Dr. Glorieux-Sullivan noted that
although both knees had a full extension and range of motion,
there was some "mild discomfort with palpation" on his left knee.
She observed an "obvious loss of soft tissue" in his lower left
extremities.  A "peripheral vascular exam" revealed

> [t]he left leg, below the knee, is markedly cooler to
> the touch than the right one.  There is also markedly
> decreased hair growth on the left leg . . . . [and] his
> dorsalis pedis pulse is much weaker on his left side
> than on the right.  I can barely feel it at all.  . . .
> [H]e does have normal capillary refill to the left
> foot.

Id. at 214.  Delafontaine, however, walked without a limp.  Id.

Dr. Glorieux-Sullivan concluded that although medical
records indicated that his knee and tibia "showed *grossly normal*

7

*anatomy* of the bone," she felt "that he has marked vascular compromise to the left lower extremity, obviously secondary to his soft tissue injury."  Id. at 215.  She discussed with Delafontaine "the fact that if there is any compromise to his vascularization, he could lose the limb and end up with an above the knee amputation."  Id.  Dr. Glorieux-Sullivan also "discussed with [Delafontaine] the fact that in his employment as a manual laborer, he is in essence pushing his leg to the limit and he might wish to reconsider what he is able to do for a more sedentary job.  We also discussed the possibility of a disability."  Id.

The following month, Dr. Glorieux-Sullivan met again with Delafontaine who "[returned] for evaluation of his left knee discomfort."  Id. at 216.  After a more careful review of his medical history and x-rays of his knee and tibia, Dr. Glorieux-Sullivan noted that

> [t]he tibia appears remarkably straight and intact considering the trauma that it went through.  In the knee, there is normal articular height and no evidence of [degenerative joint disease].  The only marked abnormality I can see is a relatively short fibula with the fibular head being quite distal to the knee joint.

Id.  Dr. Glorieux-Sullivan concluded, "[a]ll things considered, his left knee is functioning remarkably well as is his left foot and ankle.  *Perhaps* he would be better inclined to try to find a job that was less physically demanding on his left lower

extremity." Id. (Emphasis added.) Dr. Glorieux-Sullivan

"encouraged him to seek possible vocational [rehabilitation]."

Id. at 217.[4]

Well over a year later, Delafontaine filed for disability

benefits in April 2008.  He was referred to Dr. Gary Francke[5] by

the Social Security Administration.  Id. at 224.  Dr. Francke

examined Delafontaine in June 2008 and reviewed x-rays of his

knee and ankle.[6]  By this time, Delafontaine had stopped working

as an insulation installer and was a college student.  Id. at

225.  Dr. Francke observed that although Delafontaine did "not

appear to be in any active distress or obvious pain," he walked

with a "mild to moderate limp" on the left side.  Id. at 226.

Dr. Francke concluded that although scarring remained on his left

knee and calf, Delafontaine's "knee is stable and he does have a

---

[4]Dr. Glorieux-Sullivan evaluated Delafontaine four months
later after he sprained his ankle in December 2006.  She reported
that five weeks post injury, "[h]e has been able to perform
essentially full duty without difficulty or discomfort."  Id. at
219.  She stated that "[h]e is to continue working full duty
without restriction.  He may return to all of his regular
activities."  Id.

[5]The ALJ's decision referenced Dr. "Franke," id. at 28-29,
however, the parties agree that the correct spelling is Francke,
and although the copy of the records on file are far from clear,
the parties' spelling appears to be supported by the record.  Id.
at 225.

[6]It is unclear from the record whether Dr. Francke had
access to Delafontaine's medical records, although he did review
x-rays of his knee and ankle.  Id. at 225.

full [range of motion]" of the knee.  Id. at 225.  Dr. Francke

stated that x-rays "[w]ere taken of [Delafontaine's] left knee

which shows normal appearing joint surfaces, no evidence of any

fracture or dislocation.  . . . I do not see any arthritis.  The

ankle films also appear to be within normal limits."  Id. at 225-

26.  Francke concluded that "this claimant does preserve the

ability to do basic work related activities such as sitting,

standing, walking, lifting, carrying and bending."  Id. at 226.

On July 31, 2008,[7] Delafontaine was seen by Dr. Harry C.

Stearns, III, for knee pain.  Dr. Stearns had treated

Delafontaine in 1986 when he was brought to the hospital after

being hit by the truck.  Admin. R. 240.  Delafontaine reported to

Dr. Stearns that "his knee bothers him to the extent that it

interferes with his concentration in school and at home when he

is doing his homework.  It is pretty much constantly painful . .

. ."  Id.  Dr. Stearns' exam revealed that Delafontaine's left

leg showed "a deformity from his degloving injury" and continued

weakness and reduced sensation.  Dr. Stearns noted that the left

---

[7]Delafontaine's consult with Dr. Stearns took place after
his initial denial of benefits on July 9, 2008.  Cf. O'Dell v.
Astrue, No. 05-cv-40-PB, 2010 WL 3516453, at *7 (Sept. 8, 2010)
(citing cases characterizing opinions rendered by physicians
retained after the filing for benefits "advocacy opinions").

knee was "stable" and found only "vague tenderness,"[8] and "some
crepitation of the patellofemoral joint on motion."[9]  Admin. R.
240.

Although Dr. Stearns had noted that the x-rays on file did
not show arthritis, his impression was that Delafontaine suffered
from "[p]osttraumatic arthritis of the left knee, status post
severe degloving injury of the left lower extremity."  Id. at
241.  He noted that Delafontaine had been denied disability
benefits and concluded that

> I am not sure much can be done with this or to help
> him.  I do think it is a good idea for him to finish
> out his curriculum in school since I think disability
> is getting harder and harder to get and even if he did
> get it, he might lose it down the line, so having a
> sedentary vocation, I think, is good for him in the
> long run.

Id.  Dr. Stearns ordered updated knee x-rays, and during a follow
up appointment on August 14, 2008, he noted "some patellofemoral
crepitation but no instability" and that the "x-ray of the left
knee today . . . does not really show much of an abnormality."
Id. at 236.  Dr. Stearns noted that Delafontaine had "probable

---

[8]Dr. Stearns also reviewed a knee x-ray from 2006 and found
"it really was not that remarkable" and that it "did not really
show much in the way of arthritis yet, of his knee."  Id.

[9]"Crepitation" is defined as "a sound like that made by
throwing salt into a fire . . . [or] the noise made by rubbing
together the ends of a fractured bone."  Dorland's Illustrated
Medical Dictionary, 437 (31st ed. 2007).  "Patellofemoral"
pertains to the patella (or "knee cap") and the femur.  Id. at
1415.

subclinical posttraumatic arthritis of the left knee" that should be treated with Aleve and sparing use of cortisone shots.  Id.

A few weeks later, Dr. Stearns completed a medical source statement for Delafontaine.  He opined that Delafontaine could only lift or carry ten pounds occasionally, but less than ten pounds frequently.  Dr. Stearns stated that Delafontaine was capable of standing at least two hours per eight hour workday, but that he must be allowed to periodically alternate sitting or standing.  Id. at 227-28.  He stated that in his view, Delafontaine was limited in his pushing and/or pulling using his lower extremities, could never climb stairs, and only occasionally balance, kneel, crouch, and stoop because of "deformity [and] chronic pain" in his lower left extremity.  Id. at 228.  He felt that Delafontaine had limitations in attention and concentration due to "discomfort" in his lower left extremities.  Id. at 229.  Finally, he opined that Delafontaine was limited in his capacity to be exposed to vibrations and hazards like machinery and heights.  Id. at 230.[10]

---

[10]Later that month, Delafontaine returned to Dr. Stearns having fractured his elbow "when he tripped while running after a ball."  Delafontaine was observed to be "in no apparent distress."  Id. at 277.  After a few months of restricted activities with his arm in a sling, Dr. Stearns, in November 2008, stated that after a few additional weeks of caution, Delafontaine could "return to regular activities."  Id. at 277-81.

In December, 2008, Dr. Richard Kardell examined Delafontaine after he complained of a lingering fever and sore throat.  As part of an overall physical exam, Dr. Kardell notes show that Delafontaine "denie[d] joint pain . . . . knee pain, joint stiffness, . . . muscle pain, [and] muscle weakness."  Id. at 285.  Dr Kardell observed that Delafontaine appeared to be in "no acute distress," and that he "[a]mbulates on own with no device or assistance or gait disturbance noted."  Id. at 286.

Finally, in April 2009, Delafontaine was seen for "left leg pain and occasional knee pain" at the Dartmouth-Hitchcock Medical Center.[11]  Id. at 292.  At the appointment, Delafontaine "[d]escribe[d] occasional night pain and muscle spasms [in his] leg," and stated he was at the clinic "for questions concerning leg pain, and at times knee pain."  Id.  Although he "[a]ppear[ed] comfortable," the examiner noted a "[s]ignificant antalgic gait[12], . . . [o]bvious shortening on [the] left side, . . . [and a] [l]eft leg with significant atrophy, weak with extensor/flexors to leg/ankle and foot."  Id.  Delafontaine stated that he used a cane when walking outside.  Review of

_____

[11]The joint statement of facts notes that "Dr. Carr" was the examining physician, however, the office notes are signed by Richard M. Patterson, PA, and mentions that "[p]hysician coverage today is Dr. Carr."  Id. at 292-93.

[12]An antalgic gait is one "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain."  Dorland's Illustrated Medical Dictionary, 98 (31st ed. 2007).

Delafontaine's x-rays revealed mild degenerative joint disease in
his knee and "[a]pparent left limb shortening."  Id.  The
examiner provided him with a heel lift and suggested use of a
walking stick.  Id.

## C.    Delafontaine's written statements and testimony

Delafontaine's written statements and hearing testimony
describe a formerly active individual who is now severely limited
by pain caused by his 1986 injury.  He stated that

> [d]ay to day living and family life has greatly
> diminished because of my injury.  As the years went on,
> it has progressively got [sic] worse.  I can't do any
> physical labor and going to school required me to sit
> for a period of time.  Doing that I realized I cannot
> do a stationary job either.

Id. at 114.  Although he worked for many years, despite ongoing
discomfort, Delafontaine claimed he stopped working in 2007 "when
my doctor advised me to stop working or I would possibly lose my
leg."[13]  Id. at 100; see also id. at 94.  He described marked
limitations because of his injury, claiming that "I have trouble
lifting and carrying things, to walk or stand causes severe pain.
Even sitting causes discomfort."  Id. at 94; see also id. at 112-

---

[13]Delafontaine's apparent recollection of the August 2006
appointment with Dr. Glorieux-Sullivan varies in a material
aspect.  Office notes indicate not that Dr. Glorieux-Sullivan
instructed him to stop working entirely, but rather that he
should consider a "more sedentary job."  Id. at 215.

113.[14]  He described his primary daily activity as driving to
college, attending class, then returning home to "lay on the
couch and put a hot pack on my knee."[15]  During the evenings, he
reads to his children,[16] he soaks his leg, does homework, and
goes to bed.  Id. at 107.

In his function report filed in May 2008, Delafontaine
stated that he "[c]annot sit for long periods of time" and that
he is "limited to stationary activities that can't be done for
long periods of time."  Id. at 108.  Delafontaine described
difficulty bathing and getting dressed and stated that, "I don't
do a lot of house or yard work because I can't stand or sit for a

---

[14]During an April 2008 interview with Social Security
Administration personnel, Delafontaine "had a noticable [sic]
limp . . . sitting for the interview was difficult, he shifted
positions often."  Id. at 105-06.  This observation varies from
Dr. Kardell's December 2008 observation that Delafontaine
"ambulates on [his] own with no device or assistance or gait
disturbance."  Id. at 286.

[15]Delafontaine testified that he was a full-time college
student, attending two classes, four days per-week.  He stated
that because of "mainly" knee pain, he needs to move out of his
seat every 10-15 minutes "just to alleviate the, the pain a
little bit."  Id. at 16.  He does not take any medication for
pain, id. at 11, but rather treats his pain by applying warm
"rice packs" frequently during the day or soaking in a tub.  Id.
at 15.

[16]Delafontaine has two school-aged children.  One of his
children is autistic and cared for primarily by his wife.  Id. at
11, 18.  He states that he "[helps] tend to my children when I'm
able to; color, flashcards, read."  Id. at 108.

long period of time because of the pain."[17]  Id. at 110.  He also

claimed that "[t]he chronic pain makes it hard to relax and find

[a] comfortable position.  I wake up frequently.  [I] can never

get a full nights [sic] sleep."[18]  Id. at 108.  He claims to

engage in few hobbies (fishing, target shooting, reading,

watching television), observing that "[t]hey are all done

[occasionally] because I can't stand and do something for too

long and I can't sit and do something for too long."  Id. at 111.

Delafontaine claimed that he cannot lift any significant weight,

he cannot sit, stand, or walk for any extended period of time,

cannot complete tasks without frequent breaks, and has difficulty

concentrating because of his pain.[19]  Id. at 112.

---

[17]Delafontaine stated that he prepares simple meals a few
times per week, folds the laundry, and helps mow the lawn.
Mowing, however, "take[s] a couple of days because I have to take
frequent [breaks]."  Id. at 109.  He does not do the family
shopping on a regular basis, rather, he shops for "a specific
item . . . once a month for about 10 minutes."  Id. at 110.

[18]This is in conflict with Dr. Kardell's notes that indicate
no sleep disturbance, id. at 286, and notes from Delafontaine's
April 2009 appointment at the Dartmouth-Hitchcock Medical Center
indicating a report of only "occasional night pain and muscle
spasms to leg."  Id. at 292.

[19]He also claimed that pain impacts his ability to squat,
bend, reach, kneel, climb stairs, handle stress, and interact
with others.  Id. at 112-113.

**D.    The ALJ's decision**

The ALJ conducted a hearing on August 5, 2009, at which only Delafontaine testified.  A week later, the ALJ issued an order denying Delafontaine's request for benefits.  He found that Delafontaine had "severe impairments," see 20 C.F.R. § 404.1520(c), resulting from a "status post lower third tibial fracture of the left leg in 1986 with mild degenerative joint disease of the left knee."  Admin. R. 26.

Despite these impairments, the ALJ concluded that Delafontaine was capable of performing a full range of light work.[20]  See 20 C.F.R. § 404.1567(b).  The ALJ compared Dr. Stearns' notes from July, August, and September 2008 where he found Delafontaine's knee to be stable, that Delafontaine exhibited only "vague tenderness," and he reported that Delafontaine was hurt running after a ball, with Dr. Stearns' September 2008 medical source statement that Delafontaine could only lift 10 pounds occasionally and less than ten pounds frequently.  The ALJ concluded that "Dr. Stearns' clinical records provide no support for the opinion that [Delafontaine's]

---

[20]20 C.F.R. § 404.1567(b) provides:  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."

left lower extremity impairment prevents him from lifting
significantly less than he personally acknowledged being able to
lift for many years."[21]  Admin. R. 28.  The ALJ repeated Dr.
Francke's findings that Delafontaine could sit, stand, walk,
lift, carry and bend, and concluded that therefore Delafontaine
"retains the residual functional capacity to lift at least 20
pounds occasionally and 10 pounds frequently, to stand and walk
for about 6 hours during the day consistent with light exertional
activity."  Id.  The ALJ stated that his findings were
"consistent with [Delafontaine's] own self-report of his
activities, which include managing all personal care, driving to
school, attending college during the day, caring for his children
and performing household tasks."  Id.

     The ALJ specifically declined to give controlling weight to
Dr. Stearns' medical opinion, noting

          in July 2008 Dr. Stearns encouraged [Delafontaine] to
          complete college in preparation for work lighter than
          that he had performed in the past.  While he indicated
          that the claimant has significant discomfort in his
          leg, this assertion is inconsistent with his own
          clinical observations . . . and [Delafontaine's]
          activity level which has included attending college for
          three years.

Id. at 29 (citations omitted).  Instead, the ALJ afforded greater
weight to the opinion of Dr. Francke "who is familiar with the

---

          [21]As noted earlier, supra note 3, Delafontaine's former job
as an installer had him lifting 50 pounds or more frequently and
occasionally 100 pounds or more.

Social Security Administration's regulations and who did examine the claimant." Id.

At Step Four, see 20 C.F.R. § 404.1520(a)(4)(iv), the ALJ acknowledged that Delafontaine is unable to perform his past relevant work as an installer. The ALJ denied benefits at Step Five, see id. § 404.1520(a)(4)(v), however, because he concluded that given Delafontaine's age, education, and work experience, see id. App. 2, Medical-Vocational Guideline § 202 ("the Grid"), there were significant numbers of jobs available that require a residual functional capacity for light work. Admin. R. 29-30; see generally Seavy v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (explaining "the Grid").

## III. **ANALYSIS**

A five-step process is used to evaluate an application for social security benefits. 20 C.F.R. § 404.1520(a)(4). The applicant bears the burden through the first four steps to show that he is disabled.[22] Freeman v. Barnhart, 274 F.3d 606, 608

---

[22]Specifically, the claimant must show that: (1) he is not engaged in substantial gainful activity; (2) he has a severe impairment; (3) the impairment meets or equals a specific impairment listed in the Social Security regulations; or (4) the impairment prevents or prevented him from performing past relevant work. The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

(1st Cir. 2001).  At the fifth step, the Commissioner bears the
burden of showing that a claimant has the residual functional
capacity to perform other work that may exist in the national
economy.  Id.; see also 20 C.F.R. § 404.1520(a)(4)(v); Heggarty
v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991).  The ALJ's
conclusions at steps four and five are informed by his assessment
of a claimant's RFC, which is a description of the kind of work
that a claimant is able to perform despite his impairments.  20
C.F.R. §§ 404.1520, 404.1545.

Delafontaine asserts that the ALJ erred in numerous
respects.  He claims that the ALJ, at Step 2, see generally id. §
404.1520(a)(4)(ii), improperly ignored evidence of "marked
vascular compromise" in Delafontaine's left leg when describing
his "severe impairments."  Further, Delafontaine asserts that the
ALJ's finding that he is capable of light duty work is
unsupported by the evidence.  Finally, Delafontaine asserts that
the ALJ improperly ignored the treating source opinions of Dr.
Glorieux-Sullivan and Dr. Stearns.

## A.    Step 2 assessment

Delafontaine first asserts that the ALJ, at Step 2,
"inaccurately assessed [Delafontaine's] left leg impairments" in
that the ALJ did not specifically mention Dr. Glorieux-Sullivan's
finding of "marked vascular compromise to the left extremity" in

20

his Step 2 analysis.[23]  Cl. Brief at 8-9.  At Step 2, an ALJ

determines the "medical severity of [a claimant's] impairments"

and will deny any claim if an impairment, or set of impairments

is not "severe."  20 C.F.R. § 404.1520(a)(4)(2).  Impairments are

deemed "severe" if they "significantly limit[] [the] physical or

mental ability to do basic work activities."  Id. § 404.1520(c).

In his order, the ALJ found that Delafontaine had "the

following severe impairments:  status post lower third tibial

fracture of the left leg in 1986 with mild degenerative joint

disease of the left knee."  Admin. R. 26.  The ALJ briefly

described the medical evidence that Delafontaine "injured his

lower left extremity in December 1986 when he was 9 years old.

The injury included degloving of the calf resulting in the need

for skin grafting with resulting scar tissue that remains to

date."  Id.  In describing Delafontaine's impairments, the ALJ

referenced Dr. Glorieux-Sullivan's notes from August 2006, noting

that Delafontaine has "decreased motor strength of the lower left

extremity as well as some stiffness of the ankle."  Id.  The AlJ

concluded that "this impairment has more than a minimal effect on

the claimant's ability to perform basic work functions such that

it is a 'severe' impairment . . . ."  Id.

---

[23]"Vascular" is defined as "pertaining to vessels,
particularly blood vessels."  Dorland's Illustrated Medical
Dictionary, 2054 (31st ed. 2007)

21

Delafontaine contends that the ALJ's severity conclusion focused solely on "residual scar tissue, decreased motor strength and ankle stiffness," and by thus "failing to articulate the vascular dysfunction as an impairment, the ALJ undermined the accuracy of his subsequent RFC determination, and ultimately his Step 5 finding that [Delafontaine] was not disabled."  Cl. Brief at 8-9.  The Commissioner avers that there was no error because the "vascular compromise" is not a distinct injury from the "left leg injury" that ALJ accounted for in his decision.  Def.'s Brief at 4.  The court agrees.

It appears that Delafontaine's argument is essentially that because the ALJ's Step 2 analysis was insufficiently specific or somehow incomplete, it compromises the ALJ's ultimate conclusions at Step 4 and Step 5.[24]  It is simply untrue that failure to

---

[24]The court notes that in his argument, Delafontaine does not quote any case law supporting his claim of error.  Cf. LaBonte v. Astrue, No. 09-358-P-S, 2010 WL 2024895, at *3 (D. Me. May 18, 2010) (in a case briefed by Delafontaine's counsel, court cited established district case law that failure to find a particular impairment severe at Step 2 is not error unless it would necessarily have changed the outcome of the case).  Nor does he develop with great specificity his understanding of the meaning of "vascular compromise" as compared to Delafontaine's overall impairment.  For purposes of this analysis, the court must assume that Delafontaine is referring to Dr. Glorieux-Sullivan's notes from August 2006 where she observed that Delafontaine had "marked vascular compromise to the left lower extremity, obviously secondary to his soft tissue injury," and that further compromise caused by his job as an installer risked potential amputation.  Admin. R. 215.

specifically list "vascular compromise" at Step 2 undermined the later RFC assessment because the ALJ considered Dr. Glorieux-Sullivan's reference to vascular compromise.  Admin. R. 28.  See generally, SSR 96-8p, 1996 WL 374184 (July 2, 1996); 20 C.F.R. §§ 404.1545(a)(2), 416.920(e) (all impairments, both severe and non-severe are considered in assessing a claimant's RFC).  The record shows that the ALJ, in discussing his conclusions regarding Delafontaine's RFC, specifically addressed Delafontaine's concern that engaging in any work at all might risk amputation.  Admin R. 28.  The ALJ referenced Dr. Glorieux-Sullivan's August 2006 notes indicating that she told Delafontaine that he "might wish to reconsider" working as an insulation installer.  Id.  It can be inferred from the record, therefore, that Dr. Glorieux-Sullivan's concern about potential vascular compromise should Delafontaine continue working as an installer was taken into account.  This is apparent from the specific mention of Dr. Glorieux-Sullivan's concern and the ALJ's determination, at Step 4, that Delafontaine could not return to his prior work.  Cf. Lalime, 2009 WL 995575, at *8 (no error in not listing obesity as an impairment when it was specifically considered in the RFC assessment).  The court is at a loss to understand how the RFC assessment at Steps 4 and 5

---

Although the court dismisses Delafontaine's claim of error on the merits, it reminds counsel that courts need not address claims made without "developed argumentation."  Wall v. Astrue, 561 F.3d 1048, 1065 (10th Cir. 2009) (quotations omitted).

was compromised at Step 2 since the record shows that the ALJ did consider the alleged vascular compromise in fashioning an RFC.[25] See Portorreal v. Astrue, No. 07-296ML, 2008 WL 4681636, at *3-*4 (D.R.I. 2008); cf. Lalime, 2009 WL 995575, at *8; Vining v. Astrue, No. 09-269-P-H, 2010 WL 2634169, at *4 (D. Me. July 1, 2010) (because ALJ adopted an RFC assessment accounting for condition, there was no error in failure to find that condition severe at Step 2).

## B.   Residual Functional Capacity

Delafontaine next asserts that the ALJ's RFC determination was unsupported by the evidence.  He first contends that the record contains no medical source statement or opinion evidence to support the finding that Delafontaine was capable of engaging

---

[25]The Commissioner correctly asserts that the ALJ's listing of "status post lower third tibial fracture of the left leg in 1986" at Step 2, see Admin. R. 26, can be reasonably read to include the alleged "vascular compromise" as that alleged vascular compromise is long term result of the 1986 left leg fracture.  Further, in a letter submitted to the ALJ in anticipation of the hearing, counsel for Delafontaine summarized the applicable evidence at each step, categorizing that Delafontaine's severe impairments at Step 2 as "[c]hronic left leg pain, s/p fracture."  Admin. R. 146 (emphasis in original). There is no clear allegation that vascular compromise is a specific impairment to be considered separately from the left leg injury.  Rather, it is mentioned briefly in a summary of Dr. Glorieux-Sullivan's office notes as part of a longer recitation of Delafontaine's medical history beginning in 1986.  Id. at 147. It is therefore not surprising that the ALJ followed Delafontaine's lead and did not specifically list "vascular compromise" as a Step 2 severe impairment.

in light work.  He also faults the ALJ for relying too heavily on
Delafontaine's daily activities as support for his RFC
assessment.

### 1.   *Medical evidence*

Delafontaine first asserts that "the record contains no
medical source statement or opinion to support" the ALJ's RFC
assessment . . . [and] [i]ndeed, it is unclear how the ALJ
determined his RFC."  Cl. Brief at 10.

After an ALJ has determined that the claimant suffers from a
severe impairment, his or her ability to work is assessed in two
ways:  the "medical source statement" and the RFC assessment.

> Even though the adjudicator's RFC assessment may adopt
> the opinions in a medical source statement, they are
> not the same thing:  A medical source statement is
> evidence that is submitted to SSA by an individual's
> medical source reflecting the source's opinion based on
> his or her own knowledge, while an RFC assessment is
> the adjudicator's ultimate finding based on a
> consideration of this opinion **and all the other
> evidence in the case record** about what an individual
> can do despite his or her impairment(s).

SSR 96-5p, 1996 WL 374183, at *4 (July 2, 1996) (emphasis added).

Although determination of a claimant's RFC is an
administrative decision that is the responsibility of the
Commissioner, see 20 C.F.R. § 404.1527(e), SSR 96-5p, 1996 WL
374183, at *2, an ALJ, as a lay person, cannot interpret a
claimant's medical records to determine his RFC.  Manso-Pizarro,
76 F.3d at 17.  An ALJ must rely to some degree on RFC

evaluations from a physician or another expert.  Id. at 17-18.
This does not mean, however, "that there must always be some
super-evaluator, a single physician who gives the factfinder an
overview of the entire case."  Evangelista v. Sec'y of Health &
Human Servs., 826 F.2d 136, 144 (1st Cir. 1987).  That premise
"is unsupported by the statutory scheme, . . . case law, or by
common sense, for that matter."  Id.  Rather, "an ALJ is entitled
to piece together the relevant medical facts from the findings of
multiple physicians."  Mulkerron v. Astrue, No. 09-10998-RGS,
2010 WL 2790463, at *9 (D. Mass. July 15, 2010) (quotations
omitted).  Put another way, although an ALJ cannot ab initio
interpret medical records to determine a claimant's RFC, he can
"render[] common-sense judgments about functional capacity based
on medical findings."  Gordils v. Sec'y of Health & Human Servs.,
921 F.2d 327, 329 (1st Cir. 1990); Graham v. Barnhart, No. 02-CV-
243-PB, 2006 WL 1236837, at *7 (D.N.H. May 9, 2006).  Thus,
observations from medical sources which do not explicitly address
functional limitations can still inform an ALJ's RFC
determination, Gordils, 921 F.2d at 329; Graham, 2006 WL 1236837,
at *7; see SSR 96-5p, 1996 WL 374183, at *5 (judgment regarding
extent to which claimant is able to perform exertional ranges of
work goes beyond medical judgment regarding what an individual
can do), "as long as the [ALJ] does not overstep the bounds of a
lay person's competence and render a medical judgment."  Gordils,

921 F.2d at 329; cf. Brunel v. Barnhart, No. Civ. 00-402-B, 2002
WL 24311, at *9 (D.N.H. Jan. 7, 2002) (ALJ impermissibly
interpreted medical data).

Here, the ALJ found Delafontaine capable of engaging in a
full range of light work.  Admin. R. 27; see generally, 20 C.F.R.
§ 404.1567(b).  He concluded that "the claimant retains the
residual functional capacity to lift at least 20 pounds
occasionally and 10 pounds frequently, to stand and walk for
about 6 hours during the day and sit for about 6 hours per day
consistent with light exertional activity."  Admin. R. 28.  His
weight-based finding was grounded in the notion that although
Delafontaine's impairment precluded him from lifting the 50 to
100 pounds he frequently lifted as an installer, the medical
evidence on record did not support almost full disability.  The
ALJ noted that Dr. Stearns concluded in September 2008 that
Delafontaine could lift only 10 pounds occasionally.  But he did
not adopt Dr. Stearns' assessment because "Dr. Stearns' clinical
records provide no support for the opinion that the claimant's
left lower extremity impairment prevents him from lifting
significantly less than he personally acknowledged being able to
lift for many years."  Id.  The ALJ based his conclusion that
Delafontaine was capable of a full range of light work on Dr.
Francke's note in June 2008 that Delafontaine had "the ability to
do basic work related activities such as sitting, standing,

27

walking, *lifting*, carrying, and bending." Id. at 226 (emphasis added).

The ALJ's RFC assessment was properly based on evidence in the record. Light exertion is described as work where the amount lifted "is very little," 20 C.F.R. § 404.1567(b), and generally, there is a good deal of sitting and standing. Although Delafontaine described his activities post-filing in very limiting terms, the ALJ noted and the record supports that for many years Delafontaine's work was very active and strenuous. Delafontaine stated that at his job as an installer he occasionally lifted over 100 pounds, and frequently lifted 50 pounds, which equates with a "very heavy" exertional level. Id. § 404.1567(e). Dr. Glorieux-Sullivan warned Delafontaine that he would damage his leg and suggested that he pursue a "more sedentary job." Admin. R. 215. Later, after more carefully reviewing his medical history and updated x-rays, Dr. Glorieux-Sullivan found that "his left knee is functioning remarkably well as is his left foot and ankle," and that "perhaps" he should "find a job that was less physically demanding on his lower left extremity." Id. at 216. Dr. Francke and Dr. Kardell found him to be in no obvious distress, while both Dr. Glorieux-Sullivan and Dr. Stearns observed that Delafontaine presented with "mild

discomfort" and "vague tenderness."[26]  Dr. Francke stated that
after examining Delafontaine, he was capable of "completing basic
work activities."  Delafontaine's written submissions and
testimony showed that his pain management was limited to over-the
-counter pain medications and the application of "rice packs."
Objective medical tests reveal lingering evidence of his 1986
traumatic leg injury, but his knee, tibia, and ankle were seen to
function "remarkably" well.  The record showed that functionally
he, inter alia, attended college for three years and assisted in
household tasks and childcare.[27]  In determining RFC, an ALJ must
consider "all of the relevant evidence," SSR 96-8p, 1996 WL
374184, at *5 (emphasis added) (listing categories of evidence),
both "medical and other evidence."  20 C.F.R. § 404.1545(a)(3).
Taken in total, the evidence amounts to more than a "mere

---

[26]Delafontaine's argument that the ALJ should have given more
weight to Dr. Stearns' opinion will be discussed supra Part III
(C)(2).  At this juncture, the court must evaluate whether the
ALJ's RFC assessment finds support in the record.

[27]Delafontaine's contribution appears limited, but he stated
that while his wife did most of the childcare, he assists as much
as he can.  Although he testified to an inability to walk very
far, he stated that "when my kids are outside, I go out with
them."  Admin. R. 12.  Dr. Stearns' notes, however, indicate that
Delafontaine injured his elbow in 2008 while running after a ball
in the street, indicating more involvement and mobility.
Moreover, the record is replete with contradictions regarding
Delafontaine's level of discomfort and even visible disruptions
in his gait.  Where there are conflicts in the evidence, it is
the province of the ALJ, not the court, to resolve them.
Rodriquez, 647 F.2d at 222.

scintilla," see SSR 96-2p, WL 374188, at *3, reasonably

supporting the conclusion that although Delafontaine is incapable

of very heavy work, he can perform work at a reduced, namely a

light, exertional level.  See generally C.F.R. § 404.1567(b).[28]

"Although [Dr. Glorieux-Sullivan and Dr. Francke] did not

explicitly address [Delafontaine's] functional limitations, . . .

it was reasonable for [the ALJ] to make a common-sense

determination as to [Delafontaine's] RFC based on these medical

records."  Graham, 2006 WL 1236837, at *7.  The ALJ, therefore,

did not err in his finding that Delafontaine is capable of light

capacity work.[29]

---

[28]The court notes that perhaps the record *better* supports a
finding that Delafontaine retained an RFC for sedentary work.
However, the court is not charged with making or improving an RFC
determination, rather, it determines if the ALJ's view is
supportable.  See, e.g., Pires, 553 F. Supp. 2d  at 21.

Delafontaine also finds error in the ALJ's reliance on Dr.
Francke's note because it did not specify how many hours per day
Delafontaine is able to perform "basic work activities."  Cl.
Brief at 10.  In making his assertion, Delafontaine relies on a
passage in a social security policy ruling.  See SSR 96-8p, 1996
WL 374184, at *3, *4 (July 2, 1996).  Delafontaine misapplies
this provision to medical source statements, however, instead of
RFC assessments to which the provision applies.  See generally,
SSR 96-5p, 1996 WL 374183, at *4.  The court will not, therefore,
address the argument as it is not properly developed.  See Wall,
561 F.3d at 1065.

[29]Delafontaine suggests that the First Circuit Court of
Appeal's decision in Rosado v. Sec'y of Health & Human Servs.,
807 F.2d 292 (1st Cir. 1986) requires reversal.  In that case,
the court concluded that the ALJ erred in fashioning a RFC
different from an assessment by a physician hired by the
claimant's attorney.  The court found error because the "[o]ther

## 2.   *Daily activities*

Next, Delafontaine faults the ALJ for what he perceives as an over-reliance on Delafontaine's stated daily activities to support the RFC assessment.[30]   The ALJ addressed findings by Dr.

---

medical findings in the record merely diagnose claimant's exertional impairments and do not relate these diagnoses to specific residual functional capabilities. . . .  These bare medical findings are unintelligible to a lay person in terms of residual functional capacity.  The ALJ, therefore, is not qualified to make that connection himself."  Id. at 293. Delafontaine's argument ignores case law recognizing that an RFC assessment is the purview of the ALJ, who is not "powerless to piece together the  relevant medical facts from the findings and opinions of multiple physicians."  Evangelista, 826 F.3d at 144. Where "common-sense judgments about functional capacity" can be made, see e.g. Gordils, 921 F.2d at 329, an ALJ is not restricted into adopting wholesale the functional opinions of one physician whose conclusions lack support in the record, especially one hired by a claimant.  Cf. O'Dell, 3516453 WL at *7.  So long as an ALJ does not convert raw medical evidence into an RFC assessment, he has not overstepped his bounds by substituting his own judgment for that of a medical professional.

In this case, the ALJ made a common-sense assessment of Delafontaine's RFC based, in part, on Dr. Glorieux-Sullivan's medical reports portraying Delafontaine's restrictions in functional terms.  Cf. Rosado, 807 F.2d at 293 (ALJ erred where "bare medical findings are unintelligible to a lay person in terms of residual functional capacity").  Further, he properly discounted the functional assessment of Dr. Stearns because it stood in stark contrast to Dr. Stearns' own medical conclusions. Thus, the ALJ did not over-step the bounds of his expertise and "substitut[e] his own judgment for uncontroverted medical opinion."  Id. at 293-94; cf. Staples v. Astrue, No. 09-440-P-S, 2010 WL 2680527, at *4 (D. Me. June 29, 2010) (ALJ "overstepped the bounds of her expertise as a layperson [by] translating nuanced raw medical evidence" into an RFC).

[30]Delafontaine premises his argument on case law "where there was no specific reason stated for finding claimant not credible – no reference to the [claimant's] demeanor, . . . nor to any other observations indicating a basis for discrediting [his] testimony,

Glorieux Sullivan, Dr. Stearns, and Dr. Francke before concluding

that "[t]he preponderance of the evidence supports the conclusion

that [Delafontaine] retains the residual functional capacity

. . . consistent with light exertional activity."  Admin. R. at

28.  The ALJ then noted that this RFC assessment "is consistent

with the claimant's own self-report of his activities which

include managing all personal care, driving to school, attending

college during the day, caring for his children and performing

household tasks."  Id.

It is true that standing alone, the ability to perform basic

household tasks does not equate with an ability to perform

substantial gainful activity.[31]  See 20 C.F.R. § 404.1572(c); see

generally Blake, 2000 WL 1466128, at *8.  In this case, however,

the ALJ did not base his RFC assessment solely on Delafontaine's

---

such as contrary medical evidence, . . . a recitation of the
claimant's daily activities did not provide substantial evidence"
supporting an RFC assessment.  Cl. Brief at 11 (quotations
omitted and emphasis added).  But this premise is faulty because
the ALJ specifically discounted Delafontaine's claims about
needing to stop working entirely because of possible amputation
concerns based on medical documents in the record.  Further, his
RFC assessment specifically referenced Delafontaine's own
testimony and primary care provider notes.  Admin. R. 28.

[31]"Substantial gainful activity" means an ability to "perform
substantial services with reasonable regularity either in
competitive or self-employment."  Blake v. Apfel, No. 99-126-B,
2000 WL 1466128, at *8 (D.N.H. Jan. 28, 2000) (quotations
omitted).  "[A] claimant's ability to engage in limited daily
activities, including light housework, is not necessarily
inconsistent with the inability to perform substantial gainful
activity."  Id. (quotations omitted).

daily activities, but regarded his regular college attendance, personal care management, participation in family and household duties, doctors' notes indicating that Delafontaine injured his elbow "running after a ball in the street," and ability to drive (albeit for a short distance) in conjunction with medical evidence suggesting an inability to perform past heavy manual labor, but an ability to perform light work.[32]  These daily activities were not "sporadic and transitory" in nature, <u>see</u> Cl. Brief at 11, but indicate an ability to be gainfully employed, albeit at a less strenuous level than his prior employment where Delafontaine was required to lift very heavy objects, climb ladders, and bend and crawl.[33]  <u>Cf</u>. <u>St. Pierre v. Shalala</u>, No.

---

[32]Indeed, the fact that both Dr. Glorieux-Sullivan and Dr. Stearns urged Delafontaine to attend college and that Delafontaine had successfully completed three years of college implies that these physicians believed at some level that it was not beyond his personal capabilities.  The ALJ recognized this, noting that "in July 2008 Dr. Stearns encouraged the claimant to complete college in preparation for work lighter [than] that he had performed in the past.  While he indicated that the claimant has significant discomfort in the leg, this assertion is inconsistent with his own clinical observations . . . and . . . the claimant's activity level which has included attending college for three years."  Admin. R. 29.

[33]This is not the case where Delafontaine is being penalized for working to improve his life by pursuing a college education.  <u>See</u> <u>Nelson v. Bowen</u>, 882 F.2d 45, 48 (2d Cir. 1989) ("When a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working.").  Here, his three year attendance at college is viewed in light of medical records indicating something less than full disability, namely, a lack of

CV-94-232-JD, 1995 WL 515515, at *4 (D.N.H. May 25, 1995) (daily activity evidence used to assist in understanding of relationship between impairment, pain, and ability to work).  As such, the ALJ did not improperly consider Delafontaine's daily activities in his decision.  See Marczyk v. Astrue, No. 08-330A, 2009 WL 2431464, at *13 (D.R.I. Aug. 7, 2009) (no error where adjudicator noted that daily activities supported conclusion that treating source opinion was not reliable).

## C.   Treating source opinions

Finally, Delafontaine faults the ALJ for improperly considering the treating source opinions of Dr. Glorieux-Sullivan and Dr. Stearns.

### 1.   *Dr. Glorieux-Sullivan*

Delafontaine first contends that the ALJ improperly ignored Dr. Glorieux-Sullivan's "opinion that [he] should *only perform sedentary work*, failing to assign it any weight or providing any 'good reasons' for rejecting it."  Cl. Brief at 12 (emphasis added).  Delafontaine simply misstates Dr. Glorieux-Sullivan's opinion.  It is untrue that Dr. Glorieux-Sullivan opined that he should perform only sedentary work.  Rather, in August 2006, one

---

abnormality in his knee, findings of only "vague tenderness," and inconsistent observations of interrupted gait. Cf. Wright v. Astrue, No. 07-CV-2464 (JFB), 2009 WL 4547065, at *16 n.5 (E.D.N.Y. Dec. 1, 2009).

year before Delafontaine stopped working as an insulation

installer, Dr. Glorieux-Sullivan advised Delafontaine only that

"he might wish to reconsider what he is able to do for a more

sedentary job."  Admin. R. 215.  This opinion supports only the

conclusion that Delafontaine risked serious injury if he

continued as an installer, a job that required Delafontaine to

perform at least a medium exertional capacity.[34]  Dr. Glorieux-

Sullivan's notes do not indicate that she advised him to perform

only sedentary work, but simply that he should consider less

taxing employment.[35]  Further, her notes from an exam one month

later in September 2006 indicate that after a more careful review

of his medical history and objective tests, Dr. Glorieux-Sullivan

opined only that "[p]erhaps he would be better inclined to try to

---

[34]It appears from the record, however, that Delafontaine's
installation job required more than medium exertion because he
stated that he lifted 100 pounds and frequently lifted more than
50 pounds or more.  Admin. R. 257; cf. 20 C.F.R. § 404.1567(c)
(defining medium level work as requiring lifting no more than 50
pounds and frequent lifting of objects up to 25 pounds).

[35]Indeed, the ALJ specifically referenced Dr. Glorieux-
Sullivan's statements in discussing his conclusions regarding the
credibility of the Delafontaine's claim that he risked possible
amputation of his leg unless he stopped working altogether.  As
the ALJ noted, Dr. Glorieux-Sullivan's notes indicate that at
that time she advised only that he "reconsider" his employment
choice, or find a less physically demanding job.

find a job that was less physically demanding on his lower left extremity."  Admin. R. 216.[36]

Perhaps recognizing the factual weakness of his argument, Delafontaine asserts in the alternative that the ALJ erred in not contacting Dr. Glorieux-Sullivan to clarify her opinion.  But an ALJ must re-contact a treating source "if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record . . . ."  SSR 96-5p, 1996 WL 374183, at *6.  This "instruction only requires an inquiry where there is both a lack of evidentiary basis for a treating source's opinion and an inability, on the part of the adjudicator, to ascertain the basis of the opinion."  Lalime, 2009 WL 995575, at *6 (quotations omitted).  Dr. Glorieux-Sullivan's notes clearly indicate that her concern stems from the severity of his 1986 injury, the long-term effect that Delafontaine's employment as a "manual laborer" has on the already compromised health of his left leg, and her opinion that Delafontaine "might wish to

---

[36]The court accordingly also rejects Delafontaine's argument that the ALJ failed to assign any weight to, or give good reasons for rejecting, Dr. Glorieux-Sullivan's opinions.  Indeed, the ALJ's decision that Delafontaine is incapable of engaging in his prior work as an installer, see 20 C.F.R. § 404.1520(a)(4)(iv), and concluding that he has residual functional capacity for only light work, an exertional level well below that required for an installer, implicitly encompasses Dr. Glorieux-Sullivan's opinions as reflected in her notes.

reconsider what he is able to do for a more sedentary job."
Admin. R. 215.  Thus, the ALJ could readily ascertain both the
medical basis and content of Dr. Glorieux-Sullivan's opinion from
the record.  Although there is "a duty . . . to re-contact a
medical source if the information provided is inadequate to
address the question of disability," Conte v. McMahon, 472 F.
Supp. 2d 39, 49 (D. Mass. 2007), in this case, re-contacting Dr.
Glorieux-Sullivan would have been unhelpful.  Her notes indicate
that although she "discussed the possibility of a disability
[with Delafontaine]. . . . I do not deal with the disability but
would recommend that he perhaps be seen by his primary care
practitioner and discuss whether or not that would be a viable
option for him."  Admin. R. 215.  Thus, the ALJ had no duty to
re-contact Dr. Glorieux-Sullivan.

## 2.  *Dr. Stearns*

Finally, Delafontaine briefly contends that the ALJ failed
to give "good reasons" for not giving the opinion of Dr. Stearns
controlling weight.[37]  Cl. Brief 15; see generally 20 C.F.R.
§ 404.1527(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996).  The
ALJ noted Dr. Stearns' conclusions in his September 2008 medical

---

[37]This contention consists of a one sentence paragraph
restating regulation 20 C.F.R. § 404.1527(d)(2)'s requirement
that "good reasons" be discussed, see generally SSR No. 96-2p,
1996 WL 374188, at *1, followed by four sentences devoid of case
citation, asserting error in the substance of the ALJ's reasons.

source form that Delafontaine could only lift 10 pounds

occasionally, but afforded this opinion only limited weight

because it was "inconsistent with his own clinical observations

. . . and it is also inconsistent with the claimant's activity

level."  Admin. R. 29.

> When considering a claimant's RFC, an ALJ is not permitted
>
> to substitute [his] own judgment for the opinion of a
> treating source[38] on the issue(s) of the nature and
> severity of an impairment when the treating source has
> offered a medical opinion that is well-supported by
> medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with other
> substantial evidence.

SSR No. 96-2p, 1996 WL 374188, at *1 (quotations omitted); see

generally Marshall v. Astrue, No. 08-cv-147-JD, 2008 WL 5396295,

at *3 (D.N.H. Dec. 22, 2008); Lopes v. Barnhart, 372 F. Supp. 2d

185, 193-94 (D. Mass. 2005); 20 C.F.R. § 404.1527(d)(2).

More weight is given to treating source opinions because

"these sources are likely to be the medical professionals most

able to provide a detailed, longitudinal picture" of the

claimant's impairments.  20 C.F.R. § 404.1527(d)(2).  When an ALJ

decides not to give controlling weight, he is required to "give

good reasons . . . for the weight we give your treating source's

opinion."  Id.  The "good reasons" requirement mandates that the

ALJ's order "must contain specific reasons for the weight given

---

[38]It is undisputed that Dr. Stearns is a "treating source."
See generally 20 C.F.R. § 404.1502.

to the treating source's medical opinion, supported by evidence
in the case record, and must be sufficiently specific to make
clear to any subsequent reviewers the weight the adjudicator gave
to the treating source's medical opinion and reasons for that
weight."  SSR No. 96-2p, 1996 WL 374188, at *5.

Delafontaine's argument on this issue is very brief, but
appears to be two-fold.  First, he focuses on the "good reasons"
requirement in functional terms, i.e., the requirement that an
order must articulate the ALJ's reasoning for the weight assigned
to medical sources.  See Marshall, 2008 WL 5396295, at *4 (error
where treating source opinion "simply overlooked").  He then
asserts the ALJ's substantive *reasoning* was insufficient.  The
court disagrees.

First, the ALJ pointedly discussed his reasons for giving
reduced weight to Dr. Stearns' opinion.  Admin. R. 28-29.  The
ALJ found that the basis for Dr. Stearns' functional assessments
(significant leg discomfort) was inconsistent with Dr. Stearns'
clinical observations of vague tenderness and a lack of
instability.  The ALJ also noted that Dr. Stearns' finding of
significant knee pain was inconsistent with both the fact that
Dr. Stearns encouraged Delafontaine to continue with college, and
Delafontaine's "activity level which included attending college
for three years."  The ALJ also found Dr. Stearns' observations
that Delafontaine was limited to lifting only 10 pounds

occasionally inconsistent with Delafontaine's acknowledgment that for many years he lifted in excess of 50 pounds.  Id.  The ALJ certainly made clear the weight given to Dr. Stearns's opinion and the reasons for that reduced weight.  Cf. Costa v. Astrue, No. 1:09-cv-441-JL, 2010 WL 4365868, at *7 (D.N.H. Nov. 3, 2010) (ALJ erred because he completely ignored treating source opinion contradicting his RFC assessment).

To the extent that Delafontaine finds error in the *substance* of the ALJ's reasoning, the court concludes there was no error. Delafontaine asserts that the ALJ's reasoning was unsatisfactory because he focused "exclusively on the examination details in Dr. Stearns' two orthopedic progress notes."  Cl. Brief at 15. Delafontaine believes that because Dr. Stearns attended to Delafontaine when he arrived at the hospital in 1986, and likely had access to Dr. Glorieux-Sullivan's notes, the ALJ improperly "ignor[ed] the larger treatment picture of which the orthopedist was aware" and therefore did not satisfy the "good reasons" requirement of 20 C.F.R. § 404.1527(d)(2).

"Several factors determine the weight that a medical opinion is due, including (a) the nature, length, and specialty of the examining relationship, (b) the amount of objective medical signs and laboratory findings supporting the opinion, and (c) consistency of the opinion with the record as a whole," O'Dell, 2010 WL 3516453, at *6 (discussing factors that guide analysis of

proper weight to give a medical opinion); see also 20 C.F.R. §
404.1527(d)(2).  Because these factors are "malleable," Lalime,
2009 WL 995575, at *5, an ALJ is not required to methodically
apply them so long as the ALJ's decision makes it clear that
these factors were properly considered.  Id.  Delafontaine
appears to be arguing that because Dr. Stearns was present when a
nine-year-old Delafontaine was injured, and had access to his
subsequent treatment history, somehow the inconsistencies the ALJ
found in the "details in Dr. Stearns' two orthopedic progress
notes" were outweighed by the two other "important factors
ignored by the ALJ in his assessment of weight."  Cl. Brief at
15.  The court fails to see how these additional factors render
the ALJ's weighting decision improper.  First, over twenty years
elapsed since Dr. Stearns' first contact with Delafontaine and
his 2008 consult.  This hardly indicates a long term ongoing
treatment relationship.  Cf. O'Dell, 2010 WL 3516453, at *6 (in
considering nature, length and specialty of an examining
relationship, because doctor did not base opinion on ongoing
detailed treatment of claimant, it could be afforded less
weight).  Second, although knowledge of Dr. Glorieux-Sullivan's
records indicating that Delafontaine should consider less taxing
work might support Dr. Stearns' functional conclusions, they do

not render Dr. Stearns' findings any more consistent[39] with his own office notes.[40]  Accordingly, the court concludes that the ALJ did not err in choosing to assign limited weight to Dr. Stearns' opinion.

---

[39]Indeed, the Commissioner correctly points out that Stearns' RFC assessment that Delafontaine could lift or carry ten pounds frequently, stand less than two hours per workday, and must be allowed to periodically alternate standing or sitting, along with many other limitations, see Admin. R. 227-30, "suggests a less than sedentary capacity," D's Brief at 9, which is at odds with Dr. Glorieux-Sullivan's conclusions.  Any implication by Dr. Stearns that Delafontaine is capable of work at a less than sedentary capacity runs counter to Dr. Stearns' office notes that "a sedentary vocation, I think, is good for him in the long run." Admin. R. 241.

[40]Further, although Delafontaine does not make a specific argument to the contrary, substantial evidence supports the ALJ's decision to afford Dr. Stearns' opinion limited weight.  See O'Dell, 2010 WL 3516453, at *7-*9 (discussing additional factors used to assign weight).  First and foremost, of course, is the inconsistency identified by the ALJ above between Dr. Stearns' medical source statement and his office notes.  Further, Dr. Stearns viewed the 2006 x-ray as "unremarkable" and, updated x-rays showing not "much of an abnormality."  Dr. Glorieux-Sullivan's notes that showed only "mild discomfort with palpitation," little abnormality in the x-rays, and a finding that Delafontaine is advised to seek "less physically demanding" work than insulation installation.  Moreover, Drs. Francke, Glorieux-Sullivan, and Kardell noted no obvious distress or pain.  Dr. Kardell's notes indicate that Delafontaine denied joint pain, knee pain, and muscle pain, and "[a]mbulates on his own with no device or gait disturbance."

Finally, opinions rendered by physicians retained by claimant's counsel may be given less weight as courts have identified such opinions as "advocacy opinions."  See, e.g., O'Dell, 3516453 WL at *7.  Although it is unclear whether Delafontaine's counsel retained Dr. Stearns, the court notes that Delafontaine's 2008 consultations occurred after an initial denial of benefits.

**IV.  CONCLUSION**

Pursuant to sentence four of 42 U.S.C. § 405(g),
Delafontaine's motion to reverse and remand the Commissioner's
decision (document no. 9) is denied.  The Commissioner's motion
to affirm the decision (document no. 11) is granted.  The Clerk
of Court is directed to enter judgment in accordance with this
order and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  January 7, 2011

cc:  Francis M. Jackson, Esq.
     Karen B. Fitzmaurice, Esq.
     T. David Plourde, AUSA

43